UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GONZALO VALLE ARRIZON, et al.,

    Plaintiffs,

v.

    Case No. 1:20-cv-788

    Hon. Hala Y. Jarbou

CHAD F. WOLF, et al.,

    Defendants.
_____/

## OPINION

Plaintiffs Gonzalo and Efren Valle Arrizon are citizens of Mexico who have resided in this country since 2007. They are recipients of the program known as Deferred Action for Childhood Arrivals (DACA), which "allows certain unauthorized aliens who entered the United States as children to apply for a two-year forbearance of removal. Those granted such relief are also eligible for work authorization and various federal benefits." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1901 (2020).

Defendants are federal officials who worked for the United States Department of Homeland Security (DHS) or the United States Citizenship and Immigration Service (USCIS): Chad F. Wolf, Acting Secretary of DHS; Kenneth T. Cuccinelli, Senior Official Performing the Duties of the Director of USCIS; Joseph B. Edlow, Deputy Director for Policy of USCIS; Daniel Renaud, Director of Field Operations of USCIS; Mirash Dedvukaj, Director of USCIS District 12; Michael Klinger, Director of the USCIS Detroit Field Office; (unknown) Jones, a supervisory officer in USCIS's Detroit Field Office; and ten unnamed officers of USCIS ("Does 1-10").

Plaintiffs contend that Defendants denied them the opportunity to apply for and obtain advance parole so that they could travel to Mexico for a family funeral without surrendering their DACA status.

Defendants (other than Does 1-10) move to dismiss the complaint for lack of personal jurisdiction, failure to state a claim, and/or because Defendants are entitled to qualified immunity. (ECF Nos. 44, 45.) For the reasons herein, the Court will grant Defendants' motions.

## I. BACKGROUND

### A. DACA & Advance Parole

In 2012, DHS Secretary Janet Napolitano announced in a memorandum that DHS had determined, as a matter of prosecutorial discretion, "not to remove 'certain young people who were brought to this country as children that met delineated criteria.'" *Regents*, 140 S. Ct. at 1919 (Thomas, J., concurring) (quoting Napolitano's memorandum). This policy became known as DACA. It granted a "renewable 2-year period of 'deferred action' that made approximately 1.7 million otherwise removable aliens eligible to remain in this country temporarily." *Id.* Deferred action is "a decision to 'decline to institute [removal] proceedings, terminate [removal] proceedings, or decline to institute a final order of [removal].'" *Id.* at 1922 (quoting *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1999)); *see also* 8 C.F.R. § 274a.12 (describing deferred action as "an act of administrative convenience to the government which gives some cases lower priority"). "Under other regulations, recipients of deferred action are deemed lawfully present for purposes of certain federal benefits." *Regents*, 140 S. Ct. at 1922. Consequently, "[b]y granting deferred action, the memorandum also made recipients eligible for certain state and federal benefits, including Medicare and Social Security." *Id.* at 1919. And it enabled recipients to seek work authorization. *Id.*

A DACA recipient who leaves the country loses their status and cannot reenter without a legal basis for doing so. However, the Immigration and Naturalization Act (INA) permits the Attorney General, in his or her discretion and on a "case-by-case basis" to "parole into the United

States" any "alien applying for admission into the United States." 8 U.S.C. § 1182(d)(5)(A). That parole is intended for "urgent humanitarian reasons or significant public benefit." *Id.*

Before leaving the country, DACA recipients can apply for "advance parole," which allows them to leave the country "with the understanding that they may be paroled into the country on their return, provided they meet certain conditions." *See Deljevic v. INS*, 64 F. App'x 938, 940 (6th Cir. 2003). In other words, advance parole permits a DACA recipient to leave the country temporarily and then reenter with their DACA status intact.

DACA has undergone several attempted changes and legal challenges. For instance, in September 2017, then-Acting Secretary of Homeland Security Elaine Duke decided to terminate the program, citing a determination by then-Attorney General Jefferson Sessions that the policy was legally defective. *See Regents*, 140 S. Ct. at 1903. As a result, DHS would no longer approve applications for advance parole.

Several groups challenged Duke's decision, and three district courts entered preliminary injunctions in favor of the plaintiffs after concluding that the decision to rescind DACA was arbitrary and capricious, in violation of the Administrative Procedure Act. *Id.* at 1904 (citing cases). But those three courts expressly allowed DHS to continue rejecting applications for advance parole. *See Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 437 (E.D.N.Y. 2018); *NAACP v. Trump*, 321 F. Supp. 3d 143, 149 (D.D.C. 2018); *Regents of Univ. of Cal. v. U.S. Dept. of Homeland Sec.*, 279 F. Supp. 3d 1011, 1048 (N.D. Cal. 2018).

On June 18, 2020, the Supreme Court affirmed that the rescission of DACA was improper because Acting Secretary Duke failed to give an adequate explanation for her decision, as required by the Administrative Procedure Act. *Regents*, 140 S. Ct. at 1912. The Court then remanded the matter to DHS to "consider the problem anew." *Id.* at 1916.

On July 28, 2020, Acting Secretary Wolf issued a new memo stating that DHS would reconsider how to address DACA in light of the Supreme Court's decision. In the meantime, he directed DHS personnel to "reject all pending and future applications for advance parole absent exceptional circumstances[.]" Mem. from Chad Wolf, Acting Secretary of DHS (July 28, 2020), https://www.dhs.gov/sites/default/files/publications/20_0728_s1_daca-reconsideration-memo.pdf. His memo did not define "exceptional circumstances."

**B. Allegations**

Plaintiffs reside in Michigan. On August 17, 2020, their grandfather in Oaxaca, Mexico, passed away. Plaintiffs allege that their religious beliefs compelled them to travel to Mexico to participate in the funeral rites and mourning process for their grandfather. But before leaving the country, they wanted to obtain advance parole. Consequently, they attempted to apply for that parole on an emergency basis.

Plaintiffs allege that their attorney called the USCIS Contact Center several times on August 17 to arrange an appointment for filing Plaintiffs' applications. On each occasion, he explained to USCIS staff that Plaintiffs sought emergency advance parole for the purpose of participating in "religious funeral rites" for their recently deceased father. (Am. Compl. ¶ 30, ECF No. 23.)

Counsel first called the contact center at 1:00 pm. After counsel waited on hold for some time, a USCIS employee told him that he would receive a call back from an officer. An officer called counsel at 2:30 pm and stated that counsel would receive an email with instructions for scheduling an appointment. Counsel never received such an email.

Counsel called the contact center again at 6:30 pm that day. Once again, after waiting on hold, an employee told counsel he would receive a call back. Counsel did not receive a return communication that evening or the following day (August 18), so Plaintiffs and counsel decided

4

to travel to the Detroit field office to file their applications. Plaintiffs prepared all the necessary paperwork and documents, including passport photos, a translated death certificate, and translated birth certificates.

On August 19, 2020, at 8:30 am, counsel received a call from Officer Ellis and explained the situation to him. Ellis said that he would try to schedule an appointment for them at the Detroit field office. After traveling from the west side of the state, Plaintiffs reached the Detroit field office by noon, proceeded through security, and met with Supervisory Officer Jones. Counsel explained the circumstances to Jones, who allegedly responded that the death of Plaintiffs' grandfather was "not an emergency" and that Plaintiffs could not file their applications because they did not have an appointment. (*Id.* ¶ 35.) Jones allegedly told them to leave the office and not return unless they had an appointment.

From the parking lot of the field office, counsel called the USCIS Contact Center and reached "Agent Sammy." Counsel explained to Sammy that he and Plaintiffs were outside the Detroit field office and were hoping to obtain an appointment to file applications for emergency advance parole so that Plaintiffs could participate in religious funeral rites for their grandfather. Although it was 2:00 pm, Sammy said that it was "too late in the day" and that counsel would have to call back the following day. (*Id.* ¶ 37.)

A little while later, Officer Ellis called counsel and said that he had been informed by an agent at the Detroit field office ("Doe 1") that "due to a recent Supreme Court ruling, field offices of USCIS are not allowed to issue emergency advance parole documents for DACA recipients." (*Id.* ¶ 38.)

Plaintiffs filed their original complaint on August 21, 2020. They also sent a copy of it to three Department of Justice attorneys. One of those attorneys allegedly said that she would let her

"civil chief know," apparently referring to Ryan Cobbs. (*Id.* ¶ 39-40.) Plaintiffs allege that Cobbs shared the complaint with Does 1-10, but the latter defendants "decided not to offer Plaintiffs an opportunity to file their advance parole applications." (*Id.* ¶ 42.)

By August 24, it was too late for Plaintiffs to make it to the funeral. (*Id.* ¶ 43.)

On September 11, 2020, after Plaintiffs filed their complaint, Defendant Edlow sent an email to "USCIS leadership" to "'clarify [that] USCIS Field Offices retain the authority to consider emergency advance parole requests made by DACA recipients at their local USCIS Field Office.'" (*Id.* ¶ 50 (quoting Edlow Email, ECF No. 15, PageID.103).) Edlow's email directs field offices to "[f]ollow existing guidance on emergency advance parole request processing." (Edlow Email, PageID.103.) That guidance includes an internal memorandum that Edlow issued on August 21, 2020, explaining "how to process applications for advance parole . . . filed by DACA recipients[.]" (*Id.*) Apparently, clarification was necessary because Edlow's memorandum "did not reference procedures for emergency advance parole[.]" (*Id.*)

**C. Claims**

Plaintiffs assert two claims against Defendants. Count I claims that Defendants denied them their right to procedural due process.

Count II claims that Defendants burdened Plaintiffs' exercise of their religion, in violation of the Religious Freedom Restoration Act of 1993 (RFRA). The RFRA prohibits the "Government [from] substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability" unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb–1(a), (b).

## II. DISMISSAL STANDARD

A claim may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

Assessment of the complaint under Rule 12(b)(6) must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### III. ANALYSIS

**A. Personal Jurisdiction**

The defendants located in Washington, D.C.—Defendants Wolf, Cuccinelli, Edlow, and Renaud (collectively, the "DC Defendants")—argue that this Court lacks personal jurisdiction over them. Plaintiffs have the burden of establishing personal jurisdiction. They "'must show the specific facts demonstrating that the court has jurisdiction' and must make a prima facie showing of personal jurisdiction." *Carter v. Univ. of Tex. at Dallas*, No. 20-1714, 2021 WL 243811, at *2 (6th Cir. Jan. 20, 2021) (quoting *Miller v. AXA Winterthur Ins.*, 694 F.3d 675, 678 (6th Cir. 2012)). Where, as here, the court "rules on a jurisdictional motion to dismiss under Rule 12(b)(2) without an evidentiary hearing, it must consider the pleadings and affidavits in the light most favorable to the plaintiff." *Id.*

This Court can exercise personal jurisdiction over Defendants if Michigan's long-arm statute "reaches the controversy and the exercise of personal jurisdiction comports with constitutional due process." *Id.* "In Michigan, these analyses often merge, because Michigan's long-arm statute, 'extend[s] to the outermost boundaries permitted by the due process clause.'" *Id.* (quoting *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1216 (6th Cir. 1989)).

Michigan's long-arm statute provides that any of the following relationships are sufficient for a court to exercise limited personal jurisdiction over an individual: "(1) The transaction of any business within the state. (2) The doing or causing an act to be done, or consequences to occur, in the state resulting in an action for tort." Mich. Comp. Laws § 600.705.

To comport with due process, Plaintiffs must satisfy a "tripartite test":

First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough

8

> connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Carter*, 2021 WL 243811, at *3 (quoting *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).

Plaintiffs allege that one or more DC Defendants are responsible for a "custom, policy, and/or practice" of refusing to consider requests by DACA recipients for emergency advance parole, as well as refusing to allow DACA recipients to schedule in-person appointments to submit such requests. (Am. Compl. ¶¶ 51-52.) The existence of such a policy is suggested by the following: (1) Acting Secretary Wolf's memorandum stating that DHS personnel should reject all advance parole applications except where there are "exceptional circumstances"; (2) Officer Ellis's statement that field offices could not consider such requests due to a Supreme Court ruling; and (3) Deputy Director Edlow's subsequent email purporting to "clarify" that local field offices "retain" the authority to consider emergency advance parole requests in accordance with "existing guidance."

### 1. Defendants Wolf, Edlow

Construing the allegations and evidence in a light most favorable to Plaintiffs, Wolf and Edlow gave guidance to USCIS personnel about how to handle requests for advance parole by DACA recipients. And Defendants apparently agree that the local officials in Michigan acted consistent with that guidance when responding to Plaintiffs' applications. (*See* Defs.' Mem. in Supp. of Mot. to Dismiss. 1, ECF No. 12-1 ("USCIS refused to accept [Plaintiffs'] applications for emergency advance parole consistent with existing guidance at the time.").) Nevertheless, Plaintiffs have not shown that these defendants purposefully availed themselves of the privilege of acting *in Michigan*. Defendants no doubt intended that their subordinates in Michigan and elsewhere would follow their guidance. However, Defendants were not involved in Plaintiffs'

9

particular case. Thus, it is not reasonable for the Court to exercise personal jurisdiction over them. To hold otherwise would effectively give any district court in the country personal jurisdiction over Defendants for the actions of subordinates in that district, even where Defendants have no knowledge of those actions.

Other courts have found personal jurisdiction lacking in similar circumstances. *See, e.g.*, *Hill v. Pugh*, 75 F. App'x 715 (10th Cir. 2003); *Moss v. U.S. Secret Serv.*, No. 1:06-cv-3045, 2007 WL 2915608 (D. Or. Oct. 7, 2007), *rev'd on other grounds*, 572 F.3d 962 (9th Cir. 2009); *Stone v. DeRosa*, No. No. 07–0680–PHX–PGR, 2009 WL 798930 (D. Ariz. Mar. 25, 2009); *see also McCabe v. Basham*, 450 F. Supp. 2d 916, 926-27 (N.D. Iowa 2006) (citing similar cases).

In *Hill*, for instance, the plaintiff sued regional directors at the Bureau of prisons because they had "overall responsibility for Bureau of Prisons' operations" in the forum state. *Hill*, 75 F. App'x at 719. The court concluded that "[i]t is not reasonable to suggest that federal prison officials may be hauled into court simply because they have regional and national supervisory responsibilities over facilities within a forum state." *Id.* Likewise, it is not reasonable to suggest that Defendants Wolf and Edlow may be hauled into court in Michigan simply because they were involved in creating policies that were implemented by subordinates across the country.

Similarly, in *Moss*, the district court concluded that it could not exercise personal jurisdiction over the Director of the United States Secret Service where the plaintiff alleged that the Secret Service had a "nation-wide policy of engaging in viewpoint discrimination"; however, the Director did not give any instructions pertaining to the events in that case, which involved a demonstration in Oregon. *Moss*, 2007 WL 2915608, at *18. Likewise, Wolf and Edlow were not personally involved in any decisions concerning Plaintiffs.

10

In *Stone*, the plaintiff sued the Director of the Bureau of Prisons based on a policy over which the director had control. This policy was allegedly the basis for the denial of the plaintiff's inmate appeal. *Stone*, 2009 WL 798930, at *2. However, the court thus reasoned that it could not exercise jurisdiction over the Director. The court dismissed the notion that an agency head could be sued in any judicial district in the country where "an agency regulation purportedly caused a constitutionally tortious effect upon plaintiff even though there may be no evidence the federal official had any specific knowledge of or involvement with the plaintiff in any manner." *Id.* at *1. According to that court, "[t]his principle has been rejected by courts all over the country." *Id.* (citing cases). Here, as in *Stone*, Plaintiffs do not allege that Defendants Wolf or Edlow purposefully availed themselves of acting in Michigan by issuing specific directions regarding Plaintiffs' applications for emergency advance parole.

The foregoing cases are consistent with the principle that wielding supervisory authority or control over a policy that applies to the forum state, or over individuals acting in the forum state, is not sufficient to establish personal jurisdiction over an individual. The Court is not persuaded that implementing a general policy to be applied by local subordinates suffices to make the exercise of personal jurisdiction over the policymaker reasonable.

Notably, Plaintiffs fail to cite a case supporting their position. Plaintiffs rely on *Calder v. Jones*, 465 U.S. 783 (1984), but that case is inapposite. In *Calder*, the plaintiff sued the author and editor of an allegedly libelous story about "the California activities of a California resident." *Id.* at 788. California was the "the focal point of the story and of the harm suffered." *Id.* at 789. Because the defendants' "intentional, and allegedly tortious, actions were expressly aimed at California," the court could properly exercise jurisdiction over the defendants in California. *Id.*

11

In contrast, Plaintiffs do not allege intentional actions by Wolf or Edlow with regard to Plaintiffs' applications for advance parole, or any other actions by them expressly aimed at Michigan.

Accordingly, construing the record at this stage in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have not demonstrated a prima facie case for personal jurisdiction over Defendants Wolf and Edlow.

### 2. Defendants Cuccinelli, Renaud

The same reasoning applies to Defendants Cuccinelli and Renaud, except that the case for personal jurisdiction over Cuccinelli and Renaud is even weaker. Plaintiffs contend that all DC Defendants "either had an active role in creating or, at minimum, approved the guidance," and that further "investigation" is necessary to determine their specific conduct. (Pls.' Br. in Opp'n to Mots. to Dismiss 4, ECF No. 52.) But as to Cuccinelli and Renaud, these allegations are based on mere speculation. Nothing in the pleadings or evidence ties these Defendants to the injuries sustained by Plaintiffs, let alone demonstrates a prima facie case that Cuccinelli and Renaud purposefully availed themselves of acting in Michigan, causing consequences to occur in Michigan. Accordingly, the Court agrees with Defendants Cuccinelli and Renaud that the Court does not have personal jurisdiction over them.

### B. Failure to State a Claim (Count I)

In Count I, Plaintiffs assert that Defendants denied them their constitutional right to due process. Although Count I cites 42 U.S.C. § 1983, that statute applies only to officials acting "under color of" state law. *Id.* It does not apply to federal officials like Defendants. Thus, Plaintiffs presumably assert their claims under the doctrine of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), wherein the Supreme Court recognized an implied cause of action for damages against federal officers alleged to have violated a citizen's constitutional rights. *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). This

12

implied cause of action is "the federal analog to suits brought against state officials" under 42 U.S.C. § 1983. *Hartman v. Moore*, 547 U.S. 250, 254 n.2 (2006).

However, courts do not recognize an implied cause of action against federal officials in all circumstances.

> The Supreme Court has recognized a private right of action for damages for a constitutional violation committed by federal officials in three contexts: (1) under the Fourth Amendment for violations of the prohibition against unreasonable searches and seizures, *Bivens*, 403 U.S. at 397; (2) under the Fifth Amendment Due Process Clause for gender discrimination, *Davis v. Passman*, 442 U.S. 228, 248-49 (1979); and (3) under the Eighth Amendment for failing to provide adequate medical treatment to a prisoner, *Carlson v. Green*, 446 U.S. 14, 19 (1980).

*Montgomery v. Ferentino*, No. 20-3114, 2021 WL 3204843, at *2 (6th Cir. Feb. 24, 2021)

"What started out as a presumption in favor of implied rights of action [under *Bivens*] has become a firm presumption against them." *Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520, 523 (6th Cir. 2020). "[E]xpanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017).

To determine whether to extend a *Bivens* remedy, courts must engage in a "two-step inquiry." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020). First, the Court must "inquire whether the request involves a claim that arises in a 'new context' or involves a 'new category of defendants.'" *Id.* (quoting *Malesko*, 534 U.S. at 68). The Supreme Court "has 'consistently refused to extend *Bivens* to any new context or new category of defendants.'" *Abbasi*, 137 S. Ct. at 1857 (quoting *Malesko*, 534 U.S. at 68). A new context is one that is "'different in a meaningful way from previous *Bivens* cases decided by [the Supreme Court].'" *Id.* at 1859.

If the claim arises in a new context, then the Court must proceed to the second step and ask whether there are "'special factors counselling hesitation in the absence of affirmative action by Congress.'" *Id.* at 1857 (quoting *Carlson*, 446 U.S. at 18).

13

Here, there is no question that Plaintiffs' *Bivens* claims arise in a new context. *Abbasi* is instructive here. In that case, the plaintiffs challenged "confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created in the wake of a major terrorist attack on American soil." *Abbasi*, 137 S. Ct. at 1860. That policy "ordered hundreds of illegal aliens to be taken into custody and held . . . [p]ending a determination whether a particular detainee had connections to terrorism[.]" *Id.* at 1851. The Supreme Court held that these claims bore

> little resemblance to the three *Bivens* claims the Court ha[d] approved in the past: a claim against FBI agents for handcuffing a man in his own home without a warrant; a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma.

*Id.* at 1860. Similarly, Plaintiffs' claims concerning their inability to apply for and obtain emergency advance parole bears little resemblance to claims that the Supreme Court has approved in the past.

Also, special factors counsel hesitation in recognizing Plaintiffs' claim for damages in this context. First, as in *Abbasi*, Plaintiffs' claims "would call into question the formulation and implementation of a general policy" and would therefore "require courts to interfere in an intrusive way with sensitive functions of the Executive Branch." *Id.* at 1860-61. Indeed, DACA is itself a creation of the Executive's discretion not to prosecute certain individuals for violations of immigration law. And the grant of advance parole to DACA recipients is another exercise of that discretion. The Court hesitates to intrude on the manner in which the Executive exercises its prosecutorial discretion and the processes it has created to do so.

In addition, as other courts have recognized, "immigration enforcement is 'a context in which Congress has designed its regulatory authority in a guarded way, making it less likely that Congress would want the Judiciary to interfere.'" *Tun-Cos v. Perrotte*, 922 F.3d 514, 526 (4th Cir. 2019) (quoting *Abbasi*, 137 S. Ct. at 1858). "Indeed, Congress took steps to ensure that the

14

protections it provided in the INA would be exclusive of any additional judicial remedy." *Id.* (citing 8 U.S.C. § 1252(b)(9)). For example, the INA bars judicial review of "the grant, revocation, or denial of bond or parole[.]" 8 U.S.C. § 1226(e). It is unlikely that Congress would want the Judiciary to create a remedy that would allow challenges to the process for granting advance parole.

Furthermore, as in *Abbasi*, "the silence of Congress . . . is telling." *Abbasi*, 137 S. Ct. at 1862. The DACA program is a high profile and controversial one, as its history indicates. To date, Congress has not acted to formally enshrine that program into established law. To the extent the program still exists in the face of ongoing legal challenges,[1] it remains a product of executive discretion. The Court is not inclined to create a damages remedy that, in some measure, gives the program a concrete status that Congress has not bestowed upon it. Therefore, the Court will dismiss Count I for failure to state a claim.

### C. Qualified Immunity (Count II)

Defendants contend that they are entitled to qualified immunity to Plaintiff's RFRA claim in Count II. *See Tanzin v. Tanvir*, 141 S. Ct. 486, 493 & n.* (2020) (holding that the RFRA permits a claim for money damages against federal officials and indicating that a defendant can raise qualified immunity as a defense to such a claim). Qualified immunity shields public officials "'from undue interference with their duties and from potentially disabling threats of liability.'" *Guertin v. Michigan*, 912 F.3d 907, 916 (6th Cir. 2019) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)). It "'gives government officials breathing room to make reasonable but mistaken

---

[1] In a recent decision, a federal district court concluded that the DACA program is unlawful, and the court enjoined DHS from approving new DACA applications. *Texas v. United States*, No. 1:18-CV-00068, 2021 WL 3025857, at *41-42 (S.D. Tex. July 16, 2021).

judgments about open legal questions,' 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

Plaintiffs bear the burden of showing that Defendants are not entitled to qualified immunity. *See Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011). To do so, they must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735 (internal quotation marks omitted). "[C]ourts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *al-Kidd*, 563 U.S. at 735.

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority. It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that every reasonable official would know.

*D.C. v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (citations and quotation marks omitted). It is not necessary for there to be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. "Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590.

> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted. This requires a high degree of specificity. We have repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. A rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established.

*Id.* (citations and quotation marks omitted). "Notice to officials is paramount; 'the salient question' in evaluating the clearly established prong is whether officials had 'fair warning' that their conduct was [unlawful]." *Guertin*, 912 F.3d at 932 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Dismissing a case on the basis of qualified immunity at the motion-to-dismiss stage is "generally inappropriate." *Id.* at 917 (quoting *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015)). As the Court of Appeals has explained:

> The assertion of qualified immunity at the motion-to-dismiss stage pulls a court in two, competing directions. On the one hand, the Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal quotation marks omitted). But on the other, "[w]hen qualified immunity is asserted at the pleading stage," as defendants did here, "the precise factual basis for the plaintiff's claim or claims may be hard to identify." *Id.* at 238-39 (citation omitted). We have thus cautioned that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although . . . entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015) (internal citations, quotation marks, and brackets omitted). The reasoning for our general preference is straightforward: "Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is 'obvious' or 'squarely governed' by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not" for purposes of determining whether a right is clearly established. *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005)[.]

*Id.*

Nevertheless, dismissal is appropriate here. Plaintiffs do not point to a case remotely like this one, and the RFRA itself does not provide clear guidance about whether Plaintiffs suffered a substantial burden. Indeed, so far as the Court can tell, Plaintiffs' claim—applying the RFRA to DACA rights and procedures—is an entirely novel one. Thus, this is not a case in which the unlawfulness of Defendants' conduct would have been obvious or beyond debate. *See White v. Pauly*, 137 S. Ct. 548, 552 (2017) (noting that "a unique set of facts and circumstances" is "an

17

important indication" that a right was not clearly established). And that is especially true here, considering the inherently discretionary nature of Plaintiffs' DACA status, the unsettled legal validity of that status, the emergency nature of Plaintiffs' request, and the apparent lack of clarity regarding the standard or procedure for handling such emergency requests. Furthermore, until *Tanzin* (which the Supreme Court decided after the events in this case), it was not settled that individuals could be liable for damages under the RFRA. Accordingly, Defendants are entitled to qualified immunity for this claim.

## IV. CONCLUSION

For the reasons stated, the Court will grant Defendants' motions. The Court lacks personal jurisdiction over the DC Defendants. In addition, Count I fails to state a claim because the Court finds it inappropriate to extend a *Bivens* remedy to this context.[2] The Court will dismiss Count II as to the DC Defendants and Defendants Dedvukaj, Klinger, and Jones because they are entitled to qualified immunity.

What remains is the RFRA claim in Count II against Does 1-10,[3] whom Plaintiffs have not identified or served. The Court will require Plaintiffs to show cause why the Court should not dismiss the complaint against them for lack of service.

An order will enter consistent with this Opinion.

Dated: October 21, 2021 /s/ Hala Y. Jarbou
HALA Y. JARBOU
UNITED STATES DISTRICT JUDGE

---

[2] Although the unnamed Defendants, Does 1-10, did not move for dismissal of this claim, the logic of the Court's opinion applies to them as well.

[3] Does 1-10 have not raised the defense of qualified immunity, so the Court's reasoning regarding Count II does not necessarily apply to them.